J-S13019-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF G.R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.A.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1436 WDA 2023 |

Appeal from the Decree Entered November 14, 2023
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): CP-65-OC-0000058-2023

BEFORE: KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BECK, J.: **FILED: June 7, 2024**

T.A.D. ("Father") appeals from the decree entered by the Westmoreland County Court of Common Pleas ("orphans' court") terminating his parental rights to G.R.D., born May 2022 ("Child"), pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b).[1] Because we conclude that the orphans' court did not abuse its discretion in terminating Father's parental rights, we affirm.

In May 2022, the Westmoreland County Children's Bureau (the "Bureau") received a referral that Child was born testing positive for drugs. The Bureau was already involved with Father because Child's sibling was in its

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The orphans' court also terminated the parental rights of Child's birth mother, T.R.B. ("Mother"). We collectively refer to Father and Mother as "Parents." Mother did not file a notice of appeal.

custody. Father had a history of domestic violence, mental health concerns, and drug use, and he lacked housing. The Bureau obtained an emergency order of protective custody for Child and she was placed in foster care upon her discharge from the hospital. On June 21, 2022, Child was adjudicated dependent. Child has remained in the same pre-adoptive home throughout these proceedings. Permanency review hearings occurred on August 17, 2022, February 22, 2023, and August 29, 2023. At the February 22, 2023 hearing, the juvenile court found that, with respect to Child, aggravated circumstances existed as to Parents because their parental rights to Child's sibling had been involuntarily terminated.[2] The juvenile court ordered the Bureau to continue making reasonable efforts to reunify the family.[3]

On May 19, 2023, the Bureau filed petitions to involuntarily terminate Parents' rights to Child. The orphans' court held a hearing on the petitions on October 12, and October 24, 2023. Father appeared with counsel; Mother did not appear but was represented by counsel. Child's best and legal interests were represented by an individual who served both as guardian ad litem and

---

[2] *See* 42 Pa.C.S. § 6302(5) (defining aggravated circumstances to include a circumstance where the "parental rights of the parent have been involuntarily terminated with respect to a child of the parent").

[3] *See id.* § 6351(e)(2) (stating, in pertinent part, "[i]f the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue to be made").

legal counsel and stated that separate counsel was unnecessary given Child's young age.  N.T., 8/15/2023, at 3; *see also* N.T., 10/12/2023, at 5 (orphans' court agreeing with Bureau counsel that because of Child's age, legal counsel was not needed).  With respect to Father, the Bureau presented five witnesses and Father presented two, as well as his own testimony.

At the hearing, the Bureau presented evidence that Child had spent her entire life in the Bureau's custody, coming into its care the day she was discharged from the hospital following her birth.  N.T., 10/12/2023, at 7. Bureau caseworker Chelsea Crewe ("Crewe") testified that she had been working with Father prior to Child's birth, as Child's sibling was in the Bureau's custody.[4]  *Id.* at 134.  When Child was born, Father was permitted only supervised visits with Child's sibling, had not made progress in treatment, and had not demonstrated an ability to safely care for a child.  N.T., 10/12/2023, at 90-91, 104; Bureau Ex. 4.  Father also had a then-ten-year-old child with whom he was only allowed supervised visits per a custody court order.  N.T., 10/12/2023, at 91, 104; Bureau Ex. 4.  Father had a history of domestic violence with multiple protection from abuse orders issued against him, a history of drug use, mental health concerns, and lacked housing.  *Id.*

After Child came into the Bureau's care, a case plan was prepared for Father that required him to undergo a drug and alcohol evaluation and comply

---

[4]  In June 2023, Bureau caseworker Angelina Poole ("Poole") was assigned to Father's case.

with any recommended treatment; comply with random drug screens; attend Narcotics Anonymous ("NA")/Alcoholics Anonymous ("AA") meetings; continue all recommended mental health treatment/individual counseling and take prescribed medications; participate in parenting instruction, domestic abuse counseling for offenders, and anger management counseling; obtain and maintain stable and appropriate housing; and secure and maintain verifiable and legal employment. Bureau Ex. 4. Father was never more than minimally compliant with the case plan and never made more than minimal progress toward achieving reunification with Child. *Id.*; N.T., 10/12/2023, at 103.

Father had been offered parenting services since April 2021, when Child's sibling came into the Bureau's custody. N.T., 10/12/2023, at 135. Tiffany Mazary ("Mazary") from the Children's Institute testified that she had been working with Father for two years, supervised Father's visits with Child, and worked with him on parenting. *Id.* at 47. Father attended less than twenty percent of the visits with Child—twelve of the sixty-six visits offered. *Id.* Because of his lack of attendance, Father's visitation decreased from three times per week to twice per month, parenting instruction ceased, and Father was subject to a double confirmation policy, which required him to confirm both before and the day of a visit. *Id.* at 47-48, 95. For the first nine months of Child's life, Father visited her only once, when she was about two months old. *Id.* at 56-57. Thereafter, he failed to visit her again for over seven

months.  *Id.* at 97, 107.  Put another way, Father did not visit Child at all between July 12, 2022, and February 20, 2023.  *Id.* at 56.  In February 2023, the orphans' court found that, with respect to Child, aggravated circumstances existed as to Parents because their parental rights to Child's sibling had been involuntarily terminated.  Bureau Ex. 4.

Thereafter, Father began to visit Child more regularly, attending six visits between February 2023 and May 2, 2023, and resuming parenting instruction.  N.T., 10/12/2023, at 53.  In May 2023, the Bureau changed its contracted provider to In-clusion for Father's supervised visits.  *Id.* at 55, 60. Shelly Weaver ("Weaver") supervised Father's visits and, at the time of the termination hearing, had completed one parenting session with him.[5]  *Id.* at 60-61.  Weaver had difficulty scheduling and confirming visits with Father. *Id.* 62; Bureau Ex. 3.  For Weaver's first session with Father in May 2023, he missed visiting Child because he failed to confirm.  *Id.* at 61.  Father failed to visit Child at all in August 2023.  N.T., 10/12/2023, at 61; Bureau Ex. 3. Father was still on a twice-per-month- and double-confirmation-visitation schedule.  N.T., 10/12/2023, at 62.  Father attended his visits in June and

_____

[5]  In May 2023, the Bureau stopped offering Father contracted parenting services and instead referred him to a community-based parenting provider. N.T., 10/12/2023, at 137-40.  The Bureau also referred Father to other community resources, including an emergency rental assistance program, drug and alcohol evaluation, NA/AA meetings, and mental health, anger management, and domestic violence counseling.  *Id.* at 140-44.  Contracted parenting services resumed in October 2023.  *Id.* at 60-61.

July 2023, as well as the day before the termination hearing. *Id.* at 61; Bureau Ex. 3.

Weaver testified that during visits, she had concerns about Father's inconsistency with checking and changing Child's diaper, putting too much food in Child's mouth at once, and not getting down on Child's level to engage with her. N.T., 10/12/2023, at 64-65, 71, 98; Bureau Ex. 3. She also reported that Father was "very distracted" during visits and she had concerns that if another adult was present during the visit, Father would engage with that person rather than Child. N.T., 10/12/2023, at 98; Bureau Ex. 3. Weaver observed Father was inattentive to Child's special needs, failing to inquire about why Child had medical tape on her neck and failing to retrieve Child's glasses or attempt to get Child to wear them, even after Weaver told Father the glasses were in the diaper bag. N.T., 10/12/2023, at 66; Bureau Ex. 3. At the hearing, Weaver testified that she did not recommend unsupervised visits for Father with Child and believed that Father had a continued need for parenting instruction. N.T., 10/12/2023, at 75, 86. Neither Mazary nor Weaver ever recommended Father for less restrictive visits with Child. *Id.* at 97. Crewe testified that she was concerned about Father's lack of progress with parenting instruction, particularly as the curriculum is only a couple of months, yet he was unable to finish it within the two years he was receiving parenting services. *Id.* at 138-39.

Father called the court-appointed special advocate ("CASA"), Loretta Shearer ("Shearer"), as a witness at the termination hearing. Shearer began working with Father in June 2023 and attended all but one visit between Father and Child in that time. *Id.* at 206. Although she observed Father engage with Child, Shearer testified that he needed additional services and was not ready to take custody of Child. *Id.* at 210. She was of the view that Child should remain with her foster parents and she agreed with the Bureau's recommendation to terminate Parents' rights. *Id.* at 210; Court Ex. 1.

Father has a lengthy criminal history and was incarcerated on three separate occasions during Child's first eight months of life. N.T., 10/12/2023, at 98. The periods of incarceration were very brief—only a matter of days[6]— and not long enough for the Bureau to arrange visits with Child. *Id.* at 98-99. At the time of the termination hearing, Father had pending criminal charges at five dockets, which included, among others, driving under the influence of a controlled substance, simple assault, harassment, terroristic threats, use/possession of drug paraphernalia, and possession of marijuana. Bureau Ex. 1.

When Child's sibling came into the Bureau's custody in April 2021, it contracted services for Father. N.T., 10/12/2023, at 134. In addition to parenting instruction, the Bureau offered Father individual, anger

---

[6] The record reflects Father was incarcerated for seventeen, fourteen, and three days, respectively. *Id.* at 98-99.

management, and domestic violence counseling for over two years. *Id.* at 100, 114, 135. Father had not successfully completed any mental health treatment at the time of the termination hearing. *Id.* at 136. Father was required to complete a mental health evaluation following Child's birth, but failed to do so until she was days away from her first birthday. *Id.* at 33. At the hearing, Benjamin Yaroch ("Yaroch") testified as an expert in outpatient therapy. *Id.* Upon the Bureau's referral, he first met with Father on May 3, 2023, but Father was discharged soon after his evaluation for too many missed or no-show appointments, despite Yaroch's opinion that he needed more therapy. *Id.* at 33-34, 39; Bureau Ex. 2. After his initial intake session, Father only attended two of six sessions between May and September 2023, both of which were after the termination petition was filed. N.T., 10/12/2023, at 33-34; Bureau Ex. 2.

Similarly, Father did not complete a drug and alcohol evaluation until July 2023, after the termination petition was filed. N.T., 10/12/2023, at 91. The evaluation recommended ongoing outpatient treatment once per week for six weeks, but Father did not participate.[7] *Id.* at 92. The Bureau attempted to drug screen Father sixty-eight times, but was unable to screen him twenty-three times. *Id.* at 93. Of his forty-five screens, fifteen were positive for

---

[7] Father was reevaluated by the same agency in September 2023, and no further treatment was recommended because Father presented a medical marijuana card. *See* N.T., 10/12/2023, at 91-92; Father's Ex. B.

marijuana.[8]  *Id.*  Father only began attending NA meetings in September 2023, again, after the termination petition was filed.  *Id.* at 94, 143.

Father also has a long history of domestic violence.  When Child was just days old, Father's ex-wife obtained a three-year protection from abuse order against him, which prohibited him from having any contact with his ex-wife or his then-ten-year-old child.  *Id.* at 177; Bureau Ex. 5.  Additionally, in August 2022, Father's then-girlfriend, A.S.,[9] obtained a protection from abuse order against Father.  Bureau Ex. 7.  A.S.'s petition alleged violence by Father while her children were home, including burning her, grabbing her, wrapping his arms around her neck, holding her down, and taking her cell phone.  *Id.* Further, A.S. had a custody consent order with the father of her child.  In June 2023, the court granted an emergency custody motion filed by the father of A.S.'s child, giving him primary physical custody of their child and prohibiting Father from having any unsupervised contact with that child.  Bureau Ex. 6.

Father called Robert Brinker ("Brinker") as an expert witness in therapeutic services related to anger management and domestic violence. N.T., 10/24/2023, at 6-30.  Brinker testified that Father began a program in 2018, but he did not complete it until about five years later, in May 2023,

---

[8]  Father's medical marijuana card was dated May 2023; it is unclear how many of his positive screens occurred prior to that date.  N.T., 10/12/2023, at 93; Father's Ex. E.

[9]  Father and A.S. married days before the termination hearing.  N.T., 10/12/2023 at 158.

despite its relatively short duration of sixteen, ninety-minute sessions. *Id.* at 10, 16, 19; Father's Ex. C. Although Father provided evidence of completion of an anger management and domestic violence program, the Bureau had concerns about the short-term nature of the program, Father's inconsistent participation over a lengthy period of time, and the lack of individualized sessions based on Father's specific needs, particularly given Father's domestic violence history. N.T., 10/12/2023, at 136, 147-48. Poole testified that because of Father's domestic violence history, he needed additional ongoing treatment beyond the short-term program he completed with Brinker. *Id.* at 119.

Until March 2023, Father did not have a history of stable housing, had periods of homelessness, and was living in his car for some time in 2022. *Id.* at 54, 99, 105, 125. At the time of the termination hearing, Father had obtained appropriate housing. Father's Ex. D. Father reported working for DoorDash, but he was unable to provide documentation to verify his income. N.T., 10/12/2023, at 99, 105, 145. Father admitted his child support was in arrears. *Id.* at 191-92.

At the termination hearing, Father claimed to take responsibility for himself, but at the same time, did not believe he needed the services offered by the Bureau. *Id.* at 200, 203. He did not think he needed anger management or domestic violence counseling—now or ever—despite his documented history of domestic violence. *Id.* at 185-86; Bureau Ex. 2

(Yaroch counseling discharge summary stating Father "makes it clear he does not agree with [the Bureau's] involvement, and, at times, thinks he is being "'set up'"). Father believed he was a "victim" of the protection from abuse orders and thought that the Bureau was "lying to people." N.T., 10/12/2023, at 187, 200.

On November 14, 2023, the orphans' court issued a decree involuntarily terminating Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2) and (8), and finding, pursuant to 23 Pa.C.S. § 2511(b), that termination best serves the developmental, physical, and emotional needs and welfare of Child.[10] Termination Decree, 11/14/2023, ¶¶ 2.b, 2.h, 2.l. Father timely appealed to this Court and filed a concise statement pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure.

Father presents the following issues for review:

I.     Whether the [orphans' court] erred in finding that the repeated and continued incapacity, abuse, neglect or refusal of [Father] has caused [Child] to be without essential parental care, control, or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot, or will not be remedied by [Father]?

II.    Whether the [orphans' court] erred in finding that [Child] has been removed from the care of [Father] by the court, or under a voluntary agreement with the agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of [Child] continued to exist and termination of

---

[10] The orphans' court entered a decree terminating Mother's parental rights on that same date.

- 11 -

the parental rights would best serve the needs and welfare of [Child]?

    III.    Whether the [orphans' court] erred in finding by clear and convincing evidence that the Westmoreland County Children's Bureau met its burden, under 23 Pa.C.S. § 2511(b)?

Father's Brief at 4-5.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, some brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *See C.M.*, 255 A.3d at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261 (Pa. Super. 2019) (citation omitted). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (quotation marks and citations omitted).

As stated above, the orphans' court terminated Father's rights to Child pursuant to subsections (a)(2) and (a)(8) of the termination statute. Termination Decree, 11/14/2023, ¶¶ 2.b, 2.h. "This [C]ourt may affirm the [orphans'] court's decision regarding the termination of parental rights with regard to any one subsection of [s]ection 2511(a)." *In re J.F.M.*, 71 A.3d 989, 992 (Pa. Super. 2013) (citation omitted). We focus our analysis on section 2511(a)(8).

Father argues that the Bureau "cast aside the core concepts of concurrent planning and failed to make good faith efforts to remedy the conditions which led to the removal." Father's Brief at 16. Father claims that the Bureau stopped offering services in February 2023, removed Father from parenting instruction in May 2023, and changed his caseworker to someone who was unavailable during the summer of 2023. *Id.* According to Father, the Bureau "presumed that termination would be granted and withdrew all services aimed toward reunification." *Id.* Father also points to his successful completion of anger management and domestic violence counseling as evidence that he remedied the conditions that brought Child into care. *Id.*

To terminate parental rights under section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008); 23 Pa.C.S. § 2511(a)(8). Notably, this subsection "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *Interest of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022). Rather, the "relevant inquiry regarding the second prong of [section] 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.* (quotation marks and citation

omitted). Further, "the court shall not consider any efforts by the parent to remedy the conditions described [in section 2511(a)(8)] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

The orphans' court provided the following explanation for its decision to terminate Father's parental rights under the first two prongs of section 2511(a)(8):

> In examining the facts established in this matter, it is clear to the [orphans' court] termination under Section 2511(a) is warranted. At the time that the Child was removed from Father and Mother's custody, [the Bureau] had concerns related to Father's violent behaviors and his failure to demonstrate an ability to safely parent a child. The [orphans' court] took judicial notice that, as recently as May 24, 2022, a three-year Protection from Abuse (PFA) order was entered against Father in favor of [] Father's ex-wife. This PFA was the most recent example of Father's history of domestic violence, which had been an issue in the removal of both this Child and Father's previous child, to which his rights had been terminated.[]
>
> Father produced evidence from [] Brinker that he completed a relatively short course in anger management offered by Catholic Charities, which concluded in May 2023. Father contended that this course should alleviate the domestic violence concern that led the Child into placement. [] Yaroch, an expert in outpatient therapy, testified that anger management and domestic violence issues should be treated as part of an overall mental health treatment plan, which the evidence shows that Father has never fully engaged. Additionally, Father has been requested to participate in parenting [classes] since his first child was removed from his care in 2021, and the parenting deficiencies remain unresolved to this point. Father has consistently been recommended to engage in supervised visitation without making sufficient progress toward being unsupervised. Lastly, the Child has been in custody of the [Bureau] for 17 months as of the time of the termination hearing, with the same circumstances preventing the Child from returning to Father's care.

- 15 -

Orphans' Court Opinion, 12/19/2023, at 4-5.

Our review of the record supports the orphans' court's findings of facts as well as its legal conclusions. There is no dispute that Child has been in care for more than twelve months. Child was removed from Father's care because Child tested positive for drugs when she was born; the Bureau's ongoing involvement with Father and Child's sibling, who was in the Bureau's custody; Father's history of domestic violence, mental health concerns, and drug use; and his lack of housing. Child has been in the care of the same foster parents since birth. Following adjudication, Father was to complete a drug and alcohol evaluation and comply with recommended treatment; comply with random drug screens; attend NA/AA meetings; participate in parenting instruction; attend individual therapy, domestic abuse, and anger management counseling; and obtain and maintain stable and appropriate housing and employment.

The record reveals, however, that Father completed only some of his objectives before termination—anger management, domestic violence counseling, and housing. Although Father completed a drug and alcohol evaluation in July 2023 and began attending NA meetings in September 2023, neither were initiated until after the termination petition was filed in May 2023. Father's compliance with drug screens was dismal, and of the completed screens, one-third were positive. Although Father participated in parenting instruction for two and a half years, his participation was inconsistent and

parenting issues remained, requiring him to have supervised visits for the life of the case. Father was finally evaluated for individual therapy just before the termination petition was filed, but he was discharged from treatment because of lack of attendance. While Father completed a short-term anger management and domestic violence program, his attendance was sporadic and the Bureau was concerned it did not adequately address Father's individual needs, especially with his long history of domestic violence. Further, as recently as June 2023—a month after the termination petition was filed—a custody court ordered Father not to have any unsupervised contact with A.S.'s minor child. While Father had housing at the time of the hearing, he failed to provide any verification that he was able to maintain steady employment.

The record supports a finding that Father largely has not addressed, let alone remedied, the concerns that resulted in Child's removal from his care— namely his ability to safely parent and care for Child and to provide her with a healthy and stable living environment. This Court has recognized "that the application of section 2511(a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal" of his child. *Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and

> stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen [] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id.* (emphasis and citations omitted). Further, there is no record support for a finding that reunification of Father and Child was imminent at the time of the termination hearing. *See M.E.*, 283 A.3d at 832. Moreover, Father's argument that the Bureau improperly withdrew reunification services after the orphans' court found aggravated circumstances existed is without merit. The orphans' court found the Bureau continued to provide reasonable efforts to reunify Father and Child, and the record supports that finding. Orphans' Court Opinion, 12/19/2023, at 6; *see* N.T., 10/12/2023, at 137-44 (caseworker's testimony that she referred Father to specific community resources, including parenting, an emergency rental assistance program, drug and alcohol evaluation, NA/AA meetings, and mental health, anger management, and domestic violence counseling, and that in her experience, these referrals were often preferrable because services could continue beyond the Bureau's involvement in the case). Accordingly, our review of the record supports the orphans' court's findings as to the first two prongs of section 2511(a)(8).

As noted above, a finding that the Bureau satisfied its burden as to the first two prongs of subsection (a)(8) does not end our discussion, as there is a third prong that must also be satisfied—that termination of Father's parental rights best serves Child's needs and welfare. 23 Pa.C.S. § 2511(a)(8).

Although section 2511(a) generally focuses on the behavior of the parent, the third prong of section 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (en banc). The third prong of section 2511(a)(8) "is not a mere formality flowing from the existence of the preceding [two] elements enumerated in the statute." *See In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super. 1990) (addressing the necessity of a separate consideration of the needs and welfare prong under subsection (a)(5), which is identical to the needs and welfare prong under subsection (a)(8)). And although subsections (a)(8) and (b) of the termination statute are unquestionably "distinct," this Court has held that the same legal standard and same evidence may be used to satisfy both. *C.L.G.*, 956 A.2d at 1008-09; *see also Matter of Adoption of M.A.B.*, 166 A.3d 434, 448 (Pa. Super. 2017) (combining discussion of the children's needs and welfare pursuant to subsections (a)(8) and (b) because the "third element of [s]ection 2511(a)(8) requires that the [o]rphans' [c]ourt conduct an analysis similar to that required under [s]ection 2511(b)).[11]

Section 2511(b) provides, in pertinent part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

_____

[11] The propriety of using the same needs and welfare analysis to satisfy the two separate provisions of section 2511 is not before this Court in this matter, and we are bound by our prior en banc decision in *C.L.G.* Pa.R.A.P. 3103(b).

inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b). This requires that courts consider the matter from the child's perspective, placing the child's "developmental, physical, and emotional needs and welfare above concerns for the parent." *In re K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted).

Our Supreme Court has cautioned that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268-69 (citation omitted). The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *K.T.*, 296 A.3d at 1114 (citation omitted).

The law is clear that "the determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *T.S.M.*, 71 A.3d at 267 (quotation marks and citation omitted). It is not enough that there exists a bond between parent and child to avoid termination; rather, the trial court must determine whether the parent and child share an emotional bond and assess whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare," as well as the effect upon the child of severing that bond. *K.T.*, 296 A.3d at 1109. This assessment requires the orphans' court to determine

whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1109-1110 (quotation marks and citations omitted).

In addition to the child's bond with her biological parent, the needs and welfare analysis must also include the factors delineated by the *K.T.* Court, which include: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* at 1113 (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* (citation omitted). Importantly, "[t]rial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.* Consideration of these factors, however, is mandatory. *See id.*

With respect to its needs and welfare analysis, the orphans' court explained:

> [The Bureau] presented concerns regarding Father's stability for the Child in that, for a period of seven months during the dependency case, Father had no visitation with the Child. Also, Father is exhibiting drug and alcohol concerns exemplified by criminal charges for possession and driving while under the influence. The Child is currently placed in a pre-adoptive foster home [that] has been a stable placement for the Child. Lastly, the Child is a special needs child requiring physical therapy, which Father has never participated in to gain any kind of understanding.

> The best interest of the Child will be served by achieving permanency with a family that is able to fully understand the special needs of the Child and provide stability for her life. For all of these reasons, the Court found that the [Bureau] satisfied its evidentiary burden under Section 2511(b).

Orphans' Court Opinion, 12/19/2023, at 5-6.

Father asserts that the orphans' court erred because it failed to determine whether a parental bond between Father and Child exists or address how severing any such bond would impact Child. Father's Brief at 12, 19. Father argues generally that "testimony from service providers and the [CASA] show that Father and [Child] have a loving relationship," and that "testimony of a bond existing between Father and [Child was] given by numerous service providers," *id.* at 19, but fails to identify or cite to any specific evidence in the record to support this claim.

As the recitation of the orphans' court's discussion reflects, the court considered Child's needs and welfare as it relates to the excellent care she receives in her foster home, her need for permanency, and her bond with her foster parents. This is all well supported by the record. Child, who has been in a preadoptive foster home since birth, has special needs that have required physical and occupational therapy. N.T., 10/12/2023, at 22, 24. The foster parents are the sole individuals who have ensured Child receives the treatment she requires and they participate in her therapy sessions. *Id.* Additionally, at the termination hearing, Poole testified that Child's developmental, physical, and emotional needs and welfare were consistently

being met by her foster parents. *Id.* at 22-23. Child is very well cared for, "very clearly has a healthy bond" with her foster parents, and has a "strong relationship" with her foster family. *Id.* at 23, 25. Child attends extended foster family events and is treated as part of the family. *Id.* at 25. She is attached to her foster parents during visits; she consistently returned to the foster mother for security and safety with strangers in the room. *Id.* at 23. In addition, Shearer testified that Child has "excellent interaction" with foster parents. *Id.* at 209.

With respect to the bond between Father and Child, our review of the record finds no evidence of a bond between Father and Child. While the record reflects that Child may have been familiar with Father, there is no evidence of a history of Father in a caregiving role or meeting her developmental needs such that she developed an attachment to him. *See In re P.Z.*, 113 A.3d 840, 852 (Pa. 2015) (finding termination of parental rights supported under 2511(a)(8) and (b) where child was familiar with parent, but no attachment existed and parent did not have a history of engaging in a caregiving relationship with child or taking responsibility for child over an extended period). As Father observes, there was testimony that Child was happy to see Father during visits; however, there was also testimony that the Child had a generally affable attitude, which was not directed particularly at Father. *Compare* N.T., 10/12/2023, at 54 (Mazary testifying that during Father's supervised visits, Child smiled when she saw him and reacted favorably

toward him), ***with id.*** at 207 (CASA testifying that Child is very affable, pleasant, and lovable, and when she's alert, "she's happy to see everybody. It's not like anything in particular, but she's just very happy and easygoing with everyone."). This does not provide evidence of a parental bond. ***See, e.g., Interest of S.R.S.***, 2023 WL 2544886, at *8 (Pa. Super. filed March 17, 2023) (non-precedential decision) ("Although the Children are affable during the visits, the same should not be confused with a beneficial or necessary parent bond …. That the Children have done well during the visits is a testament to the Foster Parents' attention to the Children's healthy development.").[12]

Further, although there is record evidence that Father demonstrated love and affection toward Child,[13] it is well settled that a parent's own feelings of love are not sufficient to show that termination would not best serve the child's needs and welfare. ***See In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (stating that a "parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights"). Without record

---

[12] ***See*** Pa.R.A.P. 126(b) (stating that non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

[13] N.T., 10/12/2023, at 73 (Weaver testifying that Father "showed affection" and said "I love you" at most visits before leaving and expressed to Weaver that he missed Child and loves her).

evidence of a bond between Father and Child, we infer that no bond exists.[14]

***Matter of M.P.***, 204 A.3d 976, 984 (Pa. Super. 2019) (citation omitted).

Our review of the record supports the orphans' court's conclusion that terminating Father's parental rights best serves Child's needs and welfare, freeing Child for adoption by a family that is able to fully attend to her special needs and provide her with safety and stability. ***K.T.***, 296 A.3d at 1113. We therefore find no abuse of discretion in the orphans' court's consideration of the third prong of section 2511(a)(8) and subsection (b).

Based on the record before us and the standard of review we must employ, we conclude that the orphans' court did not commit an error of law or abuse its discretion by finding that the Bureau proved grounds to terminate Father's rights under section 2511(a)(8) and (b). As the orphans' court's determination is supported by the record, we affirm. ***See C.M.***, 255 A.3d at 358-59.

Decree affirmed.

_____

[14] Even if the record contained evidence of a parental bond between Father and Child, there is no support for a finding that the bond is necessary or beneficial such that its severance would result in extreme emotional consequences or significant, irreparable harm to Child. ***See K.T.***, 296 A.3d at 1109-10. Rather, the record reflects that Child never resided with Father and that she has scarcely seen him throughout her life. Father only visited Child once in her first nine months of life and attended less than twenty percent of his scheduled visits with her. On the other hand, as stated hereinabove, Child is attached to her foster parents, with whom she has spent her entire life, and is thriving in their care. ***See id.*** at 1113.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 06/07/2024